My name is Chuck Goria and I represent the petitioners, Al Gephart and Donna Gephart, who are present in court. The NASD hearing panel, after three days of testimony, determined that the Gepharts had not committed fraud and had a reasonable basis for recommending these MHP notes, the so-called trustee notes. Thereafter, the National Legislatory Council, on the bare record and on its own, and then the SEC, determined that the Gepharts had defrauded their clients because they had no basis to recommend the notes, and also that the Gepharts had basically turned a blind eye to so-called red flags, so-called danger. In fact, the Gepharts believed that their broker-dealer, Mutual Service Corporation, had looked into the MHP notes and had approved the Gepharts' participation in the MHP note program before they got involved. That, along with other indicia of viability, was the basis for their recommending the notes. There was no intent to defraud on their part, and there was no turning a blind eye, so to speak, to danger. Now, Gepharts invested their own money in these notes? They did, on three different occasions. They cooperated in both the internal probe and the SEC probe? The NASD probe, they did fully cooperate, yes. Very true. And their clients recovered 84 percent of their money back? Correct. With the Gepharts' help? That's true. Gepharts initiated an involuntary bankruptcy against the trailer park company, paying for the attorneys themselves. And they also initiated litigation against their Arizona Mission carrier, who had denied coverage. What's the basis for the commission's conclusion that they were participants? That they were participants? I'm sorry, I'm not... That they knew or turned a blind eye toward the problems, knew about them or turned a blind eye, should have known about them, should have warned their clients about them. What's the SEC's proof on that? They made some irregularities, if you will, in the circumstances surrounding the notes and came to the conclusion that the Gepharts should have investigated the situation further. There's no claim, there's no evidence that the SEC hasn't asserted that the Gepharts knew or even had suspicions about MHP. They just said that basically the Gepharts should not have recommended these notes without undertaking a further investigation. I think that's basically what the SEC has said. They were on some kind of inquiry notice to look further, that's the theory? Well, I think so. They don't, of course, use the term inquiry notice. And being a real estate attorney myself, inquiry notice is something where you can actually point to some suspicious circumstances. The circumstances that the SEC pointed to in this case were, with hindsight, suspicious circumstances. But at the time, there was an innocent explanation for each of these so-called red flags that the SEC raises. How about the high interest rate, 18 percent, 20 percent? Well, in this day and age of first trustees going for 6 percent, yeah, it sure looks high. But back in the mid to late 1990s, and this is what our expert testified at the NASD proceedings, for second trustees, the prevailing interest rate was somewhere in the mid to high teens. And that didn't include points that would be charged by the broker, which would add to the cost for the borrower. So the interest rates were not that high at the prevailing market condition. What was the principal infirmity about the notes that the SEC pointed to? Their unsecured nature or what? I think that, as I understand the SEC opinion, their biggest concern was that, or their biggest point was that the Gepharts had not made an investigation into whether or not the trustees securing the notes had been recorded, or that the trustees that secured the notes were adequately secured by the real property. Well, how about the, were they aware that these notes were second trustees? Were the Gepharts aware of that? No. That's what they understood, correct. They understood that. They were second trustees to what? Well, again, what the understanding of the Gepharts was, was that they were second trustees to a purchase money trustee that was being utilized by community service group to acquire the parks, as well as the loan monies that the Gepharts clients had. The clients were contributing to basically allow community service group first, and then MHP conversions, which came a little later, to acquire the parks. Well, did they know the amount of the purchase money? The Gepharts did not. But that brings up a key factor here that, again, was a basis that the Gepharts relied on in believing that these were regular transactions, regular real estate loans, and that is the role that First Regional Bank played. First Regional Bank, based on its custodial agreement with the clients of the Gepharts, was required, or actually did require, before they would release these custodial monies, First Regional Bank required that they be presented with the proposed note, the proposed trust deed, and the escrow instructions, which certainly, in direct response to your question, Your Honor, would have provided more details about each of the purchase transactions. And the Gepharts believed that these documents were being provided to First Regional Bank. And they not only believed that they were being provided by Jack Archer, who was acting as the first trustee, kind of like the coordinator here, but they also assumed, and I think reasonably so, that First Regional Bank would not have released those monies without the documentation that their own custodial agreement required. And as long as we're on that point, I would like to... You started out with the panel's conclusion, but the council and then the SEC rejected the panel's conclusions. What's our standard of review? Are we supposed to rethink what the facts show and conclude that they were, as the panel said, merely negligent, or what's our role here? Well, Your Honor, I think that that was addressed, actually, by the SEC in their reply brief. And we also addressed it in our opening brief, that, for example, in the case of SEC, the Goldfield Deep Mines Company, this court said that, and I'm quoting, the application of a rule of law to the established facts is reviewed de novo, where the question requires consideration of legal concepts in the mix of fact and law, as distinguished from an essentially factual inquiry. Well, isn't this a factual inquiry? How are we supposed to know, sitting here, whether or not what they did in the context of this sophisticated, complex business operation, whether the panel was correct or the council and the SEC were correct? In other words, what is the principle of law we're supposed to be focusing on? Scienter? I'm sorry? Are we focusing on scienter, or what are we focusing on? Yes, basically on recklessness. That was the basis for the SEC to make its finding of fraud here. And your argument is that recklessness is not enough? Our position is that recklessness is defined by this court in the Silicon Graphics case. That standard was not met in this case, and the facts are not really in dispute. The facts, as specified by the NASD hearing panel, and also in the SEC opinion, there aren't any disputes in the facts. The facts are established here, and what our position is, is that we believe it's this court's obligation to review the principle of law, the recklessness standard de novo, and to determine whether or not the Gepharts were actually reckless in terms of the Silicon Graphics definition, which is, quote, an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. And putting that in the context of what actually happened here, for which there is no dispute, the Gepharts truly, sincerely, and reasonably relied upon their broker-dealer, mutual service corporation, who they believed had reviewed this program, who they believed had reviewed the specific notes. They did actually review the notes, and they reviewed the rest of the package that had been sent to them early on by the Gepharts, and the Gepharts, well, why would they be asking for all this documentation if they weren't going to review it and they weren't going to give us the green light on this? And then we turn to... Nope, we agree that these occurrences took place. There's no factual dispute on whether these occurrences took place, but we just don't believe that that is an adequate enough answer to, or an adequate enough basis to allow the Gepharts to have recommended these notes. And that's basically an application of this legal principle of recklessness, and the SEC saying, no, it's not enough basis. The NASD hearing panel says, yes, it is enough basis, and we're asking the court... Here's my problem. I look at the NAC finding that says, the evidence established that the Gepharts acted with more than just empty-headedness and engaged in an extreme departure from the standards of ordinary care. The SEC looks at the evidence, looks at the NAC and the panel findings, and concludes that they acted recklessly. Now, those are labels, okay? You say the facts aren't in dispute. So what is it... Are we supposed to go back and put ourselves into the position of the people who deal with this kind of securities fraud claims and say, if we were sitting in their shoes, we don't think that the kind of conduct was sufficiently reckless in the dealing and investments in Second Trust deeds. Something that we have deep experience in not. So that's the... I understand that that's the conundrum, but to simply say, well, we're applying the law to the facts of the facts of the law, my understanding of our review function is to be extremely deferential to the SEC. I mean, they're the expert agency that's out there to enforce securities transactions. I'm trying to get a hook on what the flaw is, besides simply reweighing the evidence through our prism as appellate judges. Right. I see that that's a major issue that I anticipated, quite frankly, Your Honor. And I think that, again, though the facts are not in dispute and the evidence does not really need to be weighed in the sense that this bit of evidence is more important than that bit of evidence. We have to make a judgment somehow that in the industry that the SEC is overseeing, that this is something less than recklessness. Right. And that's why I came prepared with the gold mines case, the SEC, the Goldfield Deep Mines Company case, because what you have here are established facts. And what we're asking the court to do is to apply the rule of law that was specified in the Silicon Graphics case to these established facts. And we believe that the court is obliged to undertake a de novo review of the facts because these facts are established and we believe that the SEC got it wrong, quite frankly. We believe they didn't. You know, the NASD decision, ER-046, just lays out a whole list that starts out at the top of page ER-046, which is page 15. Respondents argue that Alvin Gebhardt did everything he could to make sure the trailer park deal was legitimate. We could not disagree more. For the most part, the Gebhardts recommended MHP notes to customers simply on the basis of information that Archer provided to them and the fact that the first three of their customers who invested had not complained. And then they go on. Didn't know to which bank the account's customers would be deposited. Didn't know or ask about the identities of CSG's shareholders, MHP's officers, their compensation. It just goes on there for the rest of that long paragraph. Yes, that was the decision handed down by the National Adjudicatory Council. The NASD hearing panel was contrary to that, of course. They found no fraud on the part of the Gebhardts and found that the Gebhardts had a reasonable basis. But, again, both the, I mean, the record is there and the facts were established for all three opinions, both the NASD hearing panel, the National Adjudicatory Council, and the SEC. And neither of the latter two opinions took exception or found that the Gebhardts had not, for example, conversed with their broker-dealer about the notes. None of the three bodies found differently in terms of the Gebhardts contacting their broker-dealer in 1998, sending them a copy of the note for their broker-dealer's review, sending them contact information of MHP conversions, and then receiving back a written note from their broker-dealer saying that the investment had been approved. So, I mean, that is evidence that we are asking this court to consider, along with the other evidence that the Gebhardts did, in fact, have an adequate basis. They did not turn a blind eye to any known danger, to any suspicious circumstances, and that's not the way they did business. They wouldn't have invested their own money. Did they have an attorney advising them on this transaction? Well, during the time in question, no, they didn't have an attorney, Your Honor. They believed that MHP conversions had cleared it with their counsel that these notes were not securities. They believed that Jack Archer, who was the one that introduced them to the program, had also conversed with counsel and had assured them that as long as there were ten or less investors per park, there was no problem with the securities law. You want to save some time.  Thank you, Your Honor. May it please the Court, William Shirey for the Securities and Exchange Commission. Your Honor, the Gebhardts were securities professionals. With that comes a very clear obligation. They have the obligation to conduct independent due diligence of securities they recommend to their clients, particularly in an instance such as this where we are dealing with an obscure security and with a new company. MHP had been in existence all of the time. This is a fraud case, though. This isn't a negligence case, right? That's absolutely right, Your Honor. But the standard of care is relevant here because it goes to the standard of care, and the breach with which they engaged is relevant here because that is the first prong of the recklessness standard in our determination of whether they recklessly deceived their clients by simply not knowing. Where's the evidence, and at least as important, where's the SEC's finding that they intentionally defrauded? There is no finding of intentional fraud. So isn't that critical? Isn't that what Silicon Graphic says? Your Honor, I believe that under this Court's Embank decision in Hollinger, recklessness is a permissible basis for see-enter in this circuit, and recklessness is a twofold inquiry. The first inquiry is whether there was an extreme departure from the standard of care. That's why I refer to their duty as securities professionals. Individuals who brought these securities to their clients but for the Gebhardts, these clients would never have known of these securities. I think that's a very safe assertion. Now, the Gebhardts did not engage in that independent duty of care, and that was a finding, and I think this is important, that was a finding of both the hearing panel, of the NAC adjudicatory panel, and the Commission itself. And I believe it was Judge Pragerson who identified ER 046, where he says that effectively the Gebhardts only relied on Archer. The Commission has certainly stated that in our opinion. But you can also find that at ER 020 in the hearing panel's determination. The Gebhardts, as the NASD adjudicatory panel said, they could not have done less to engage in an independent investigation here of the securities that they brought to their clients. So that's one evidence, that's one piece of the puzzle of them extremely departing from their duty of care. But in addition to that, there were myriad red flags here. The Gebhardts weren't allowed to contact the issuer. The only person the Gebhardts were allowed to deal with was Archer, the issuer's middleman here. Someone who was directly receiving money from the issuer, commissions from the issuer. The notes were vaguely worded. They never set forth what the names of the trailer parks were that they were purportedly securing, if I remember. The company was virtually brand new. The Gebhardts were receiving their commissions in the form of personal checks from Archer, and the list goes on. Is the test for recklessness objective or subjective? It's both, Your Honor. The first prong, the one we're discussing right now, which is the departure from the duty of care here, is objective. The second prong, which I'll turn to now, is the question of whether the information that the Gebhardts relied on was so flimsy that it must have been the case. And the word must have, not should have, but must. Exactly, must have been the case, that the Gebhardts were aware of the risk, that they were misleading their clients. They didn't have to know about, contrary to the way it's asserted in the reply brief, the Gebhardts didn't have to know about the actual fraudulent issues with the transaction. And they didn't. There's no finding to that effect. I can't speak one way or the other. There's no finding. There's no findings. There's nothing in the record we can point to that suggests that they did. But what we can point to from the record, I think, is they did put their own money in. Your Honor, when the notes collapsed, the Gebhardts had approximately $36,000, and this is actually in the Commission's opinion or the NASD's opinion, they had approximately $36,000 invested. Let's compare that to the $110,000 the Gebhardts had already made in commission. So, yes, they had their money invested, but they did not walk away empty-handed here. They netted about $80,000 from this entire transaction, and that's clear from the record both in the adjudicatory panel's decision as well as the Commission's decision. So there's a reason that that is why the Commission did not, well, in any event. People who are on inquiry or you would think knew that there were some infirmities in the product would not invest in it. Actually, I'm not sure, and there's no finding about this one way or another in the record, but I don't necessarily believe that's the case in the situation. But there is a finding that they invested their own money, right? Right. But I don't believe that Your Honor's conclusion that if they didn't believe in it, they would invest it. It was a question, actually. Particularly in a situation such as this where the bulk of the money they're actually making is in commissions. So they have an interest in sort of not necessarily keeping a scheme alive, but sort of kind of keeping the gravy train going. And they want to be very, I think. They want to be very what? They want to be co-joined with the issuer here. And one way that you seem like you have confidence in the issuer is to invest in it. So you're saying that this was a charade? No, I'm not saying that at all, Your Honor. Instead of being considered positive, it ought to be considered a negative? Your Honor, I think it was not something that the commission put weight on, nor was it something that the adjudicatory body put weight on. What we looked at was the fact that when the Gepharts went to invest, now turning to the second prong of the recklessness standard, the sort of the subjective component of what the Gepharts believe, the Gepharts only had information from Archer. That was the only affirmative source of information. All three bodies that have reviewed this case have found that to be so. When the Gepharts went to recommend this to their clients, they only had Archer. Archer was directly connected with the issuer, and yet they did not see any evidence that the notes were recorded. They did not conduct an independent review, ask for any materials to show that the notes were being recorded. They didn't ask for appraisals to see that the notes were not over-encumbered, the properties were not over-encumbered. But nonetheless, based solely on Archer's representations, they represented to their clients that these were trustworthy investments. And, Your Honor, we submit that the law is very clear. Here's my problem. I go to the SEC states at ER 79, what appears to be the correct standard. Yes. Okay. They say that scienter may be established by showing a recklessness, although Silicon Graphic says it has to be deliberate recklessness, and then goes on to say an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the actor, and we're saying that's not the case, or is so obvious that the actor must have been aware of it. So that's the standard with the emphasis on must as opposed to should. And yet when we get over to ER 82A, I guess it is, 82A, talking about the good faith finding or issue, it says, third, the personal investment the Gebhards made despite their own failure to investigate the notes cannot render reasonable the Gebhards' actions in light of the numerous red flags. That sounds more like a recklessness in the sense of they should have known better, but it stops short of saying, and I keep looking for something that gives me confidence, that the SEC was focused on the intent element of recklessness, that is deliberate recklessness as opposed to a high degree of negligence. And that's my problem here. And the way this is being argued by both sides makes me worry that the SEC wasn't focused enough and hasn't articulated enough why it is that it is the equivalent of must have known as opposed to should have known. Your Honor, first if I could address the Silicon Valley and the deliberate recklessness. That, as I understand that decision, was the court's attempt to emphasize that recklessness is closer to an intentional fraud versus a negligence formation, but that the standard still remains the same from Hollinger and the Ombank decision. The court has not reversed the Ombank decision on Hollinger that talks about the must have. It's after and it gives meaning to what degree, because it's citing to the Hockfelder opinion in the Supreme Court, I believe, isn't it, Silicon Valley? I believe so. Because it's interpreting what recklessness means in the 10B. Which Hollinger as well had cited to as well in the footnote dealing with recklessness. No. It's emphasizing that the recklessness is at a level where you can infer circumstantially that they intended this outcome. And it wasn't just because they should have known, but they must have known. And here, Your Honor, and then I think that's important to turn to really what I think is the crux of the issue, which is the good faith exception and whether or not they actually believed in the notes. And what the commission said is that, and this is based in part on, for instance, the Third Circuit's decision in Infinity Group, that the good faith exception to recklessness is not meant, the fact that you may have a sincere belief, that you may subjectively believe in the notes here, is not enough for a securities professional to avoid recklessness. There's a second element to it. And that element, which the hearing panel didn't appreciate, is that you have to have a reasonable basis for your belief in order to qualify for the good faith exception. So it's first a subjective belief, then it's based on a reasonable basis. And then with respect to their one-year personal, and again, this is their one-year. Maybe I can help focus because we're running out of time. Where would you go in the SEC's decision to say that they've come closest to saying that they must have known as opposed to should have known? Your Honor, the commission set forth all the evidence. Point me to the language. I've got the pages in front of me. So if you were going to, between, I see what they say, but, you know, basically they zero in on it under Section C, fraudulent misrepresentation of the mentions. And that's what I'm looking. So in those pages, what would you argue? Your Honor, that sentence is not in the opinion. The sentence that precisely says they must have known is not in the opinion. However, I would argue that first the commission set forth the standard here in a very large opinion, set forth the standard, and then the commission walked through and arrived at the same conclusion that the adjudicatory counsel decision reached and the same decision that the hearing panel reached with respect to the only basis, the only affirmative basis for knowledge here was Archer's representations, and those were inherently unreliable because the Gepharts knew that Archer was the issuer's metal man, and it has long been established since the Second Circuit's decision in Hanley, which is of course as adopted in Dean Rauscher, that a securities professional who has fiduciary obligations to their client, who brings to their client these securities in the first instance, has an obligation to go beyond the statements of the issuer and those associated with the issuer. And as a result, because the Gepharts didn't do that, because they didn't honor that long-established obligation of independent due diligence, the commission, having set forth the standard, having looked through the evidence and arrived at the conclusion that Archer was their only affirmative source, there's no sentence that affirmatively says it, but the commission did arrive at the conclusion that the Gepharts must have known of the risk that they were misleading. I don't think that's ñ they didn't say it, and they could just as easily have been saying should have known, including what you just said, based on what their obligations are and they have these duties, fiduciary, everything else. There's no doubt that they should have. The question is whether it's meaningful to make a distinction between should and must. Your Honor, we would ñ I'm having trouble on this opinion imputing to the SEC that they made the distinction as they applied it, because the words that they used tend to be even quoting from the NAC. They said that more than just empty-headedness engaged in an extreme departure from the standards of ordinary care, and so much so that they had to have known, therefore, they really intended the outcome. Well, the empty-headedness, of course, goes to the subjective component. I understand, but that's what I think they're addressing here. But, Your Honor, I would just submit that walking through the evidence here as the commission did, first setting forth the standard, then walking through the evidence, the commission had arrived at one conclusion, and this is clear, I think, from the opinion that Archer was the only source of affirmative information, and that there is that one sentence that ideally, I confess, should be here in an ideal world, that says that the Gepharts, therefore, must have known, I don't think is fatal to this opinion, because the only source of information was an inherently unreliable source of information, Archer, and that is as a matter of law. The commission has repeatedly stated that. That is almost no basis. Archer was inherently unreliable because? Because he was directly connected with the issuer. He was the individual who had proposed the scheme, the note scheme, to Scovey and Mornier. That's clear from the factual record. Archer was directly receiving commissions. Archer, as my opponent testified, was the individual who originally, I think, was helping to make sure that the notes were being recorded. This is someone who is not just a mere liaison, like a real estate agent or a security professional. This is someone who is directly connected with the issuer, and he was the only affirmative source. And so, again, coming back to Your Honor's point, ideally there would be a sentence that said they must have known, but it's clear as a matter of law that you cannot rely blindly on someone who is the direct, who is directly connected, and they did. They're not relying on their own, the organization that they were tied in with. Your Honor, again, as a matter of law, it has long been established that a securities professional has their own independent duty to investigate, and they can't rely on their employer, their supervisor. I mean, their employer, their supervisor. Here, there was some reference to First Bank. Didn't all the information go to the employer? No, Your Honor. In fact, if you look at the analysis under Rule 3040, one of the conclusions the Commission arrived at, and I think this was also the conclusion of the National Adjudicatory Council, is one of the obligations under Rule 3040 is that you have to turn over sufficient detailed information for MSC, to make an independent evaluation about the notes. And the Commission found, and the National Adjudicatory Council found, that the information that was turned over, and I can provide Your Honor a cite to this if you wish, give me a second, was wholly insufficient for that. So they had not complied, even in turning over enough information to MSC for them to make any kind of finding. Furthermore, we would submit that it was reckless. I mean, although this is not directly found in the Commission, I think it's arguably reckless to not follow up to find out what conclusions that MSC had arrived at. There was no evidence that they ever did that. In fact, they didn't. They simply relied on the silence. I think you're almost out of time. Let's suppose that, I'm not saying this is the outcome, but suppose we were not satisfied with the clarity of the SEC opinion. What would be the remedy? The remedy would be reversal to the SEC for the SEC to make the proper finding, to answer the question about whether we had, in fact, found that they must have, and the SEC would issue a new opinion to that effect. And what does that process involve, new evidence or just going back? It would come back down on the same record, Your Honor, and then it would go back up. Thank you. Thank you very much, Your Honor. I just have a few quick points, Your Honors, if I may. We, of course, agree that the SEC has clouded the distinction, in its opinion, between negligence and recklessness, particularly deliberate recklessness, because we don't believe that there is any evidence that the Gephards, of course, they didn't know about the danger, and there's no evidence that they must have known about the danger. The fact that they relied to some extent, not nearly as much as Mr. Shirey would suggest, but the fact that they relied to some extent on Archer's representations does not establish, as a matter of law, as he said, that the Gephards must have known of the danger. That's illogical. The Gephards did, in fact, listen to what Jack Archer had to say. But at Mr. Archer's own suggestion, they contacted their broker-dealer and provided them with all of the information, both verbally and in writing, that Mr. Archer had provided. And as he was doing this in his telephone conversation with Michael Poston, the compliance director of Mutual Service Corporation, Al Gephard testified, and this was accepted by all three of these bodies, that, yeah, Poston told him, yeah, sounds like a good idea. I'm familiar with these because they have a lot of mobile home parks in Florida, where his office was. So far from relying solely on what Archer said, the Gephards had independent... Let me just ask you this. What does it take on a, you know, where promissory notes are being sold? I'm sorry? Where promissory notes are being sold, what does it take to characterize that sale as a security transaction? The law at that time in California, anyway, was that if there are less than ten investors, so to speak, less than ten lenders, then there's a presumption that it is not a security. Okay. How many were there here? Well, as represented to the Gephards, they thought there were only ten or less per park. As it turned out, there were more than ten. In fact, towards the end of this investment, Your Honors, I'm not going to try to sugarcoat this, there was fraud. There was fraud on the part of MHP, and sometimes they were putting people on parks that they didn't even own. So there was fraud in that respect. The heyday of security has suckered them. I'd be happy to answer any questions that the Court has. Well, do you look to the amount of the interest? I'm sorry? A promissory note meets the definition of a security. Quite frankly, Your Honor, I'm unfamiliar with that test. What's the definition of a security? Well, I think I would definitely go over my time, but as I understand it, Your Honor, it could be basically any type of contract, any type of investment contract. And I'm not saying that trustee notes can never be securities. In fact, they certainly can be classified as securities. But in this case we get a return through the efforts of others. And in this case, the Gepharts were told that it was not a security. All right. Thank you, Your Honor. Okay, thanks. And we'll secure this session.
judges: Pregerson, Hawkins, Fisher